LINDSLEY et al. v. DALLAS CONSOL. ST. RY. CO. et al. (No. 7956.)

(Court of Civil Appeals of Texas. Dallas. Dec. 15, 1917. Rehearing Denied Jan. 12, 1918.)

1. INJUNCTION ⊂⇒65—RIGHT TO REMEDY—INTEREST IN SUBJECT-MATTER.

Street railway having valid franchise to use city streets has such an interest in the use of the city streets that it may sue to restrain the use thereof by jitneys licensed under alleged invalid ordinance.

2. INJUNCTION ⊂⇒65 — JITNEYS — ILLEGAL OPERATION.

Street railway having valid franchise to use city streets may by injunction proceed against city for purpose of declaring invalid legislative grant of power to license jitneys, in order to avoid ruinous multiplicity of suits, since otherwise it must resort to individual suit against each licensee.

3. INJUNCTION ⊂⇒65 — RIGHT TO WRIT — THREATENED INJURY.

Where city passed ordinance for licensing jitneys which street railway alleged was invalid, it could sue to enjoin threatened enforcement of the ordinance directly against the city.

4. MUNICIPAL CORPORATIONS ⊂⇒57—POWERS.

Municipalities or other legislative instrumentalities may exercise only such legislative powers as are expressly or by implication delegated to them by the Legislature.

5. MUNICIPAL CORPORATIONS ⊂⇒108 — JITNEYS—ORDINANCES—VALIDITY.

Dallas City charter, art. 3, subd. 1, requires all powers conferred on city to be exercised by mayor and board of commissioners, unless otherwise directed. Article 2, § 8, subd. 7, empowers the city, through the board of commissioners, to regulate charges of franchise holders and to prescribe the service upon fair hearing. Article 2, § 8, subd. 27, authorizes regulation of charges of carriers. Article 8, § 1, provides for the initiative and referendum of ordinances. *Held,* that as regulation of carriers must be by the board of commissioners an ordinance regulating jitneys and authorizing them to be licensed, passed under the initiative and referendum clauses, is invalid.

Appeal from District Court, Dallas County; Kenneth Foree, Judge.

Injunction by the Dallas Consolidated Street Railway Company and others against Henry D. Lindsley and others, as Mayor and Board of Commissioners of the City of Dallas. From order of temporary restraint, the defendants appeal. Affirmed.

L. R. Callaway, Lee Richardson, and Royall R. Watkins, all of Dallas (Dwight L. Lewelling and George Clifton Edwards, both of Dallas, of counsel), for appellants. Thompson, Knight, Baker & Harris, of Dallas, for appellees.

RASBURY, J. This is an appeal from an order of the trial court temporarily restraining appellants, the mayor and board of commissioners of the city of Dallas, from observing or acting under the provisions of an ordinance granting and regulating the use of the city's streets by motor busses, commonly known as jitneys. The following general statement of facts disclosed by the record is necessary. Other specific facts will be noted when necessary in discussing the issues presented. Under the authority conferred by the Legislature, the city first undertook to regulate the jitney traffic by ordinance of July 31, 1915. Further regulation was had by ordinance of April 19, 1916. On January 5, 1917, another regulatory ordinance was passed and all former ordinances repealed. On February 5, 1917, the last ordinance was declared void by the judge of the Forty-Fourth district court and the city restrained from enforcing or observing it. On April 3, 1917, the electorate of the city, under the initiative and referendum provisions of the charter, by decisive majority adopted an ordinance regulating jitneys. On June 19, 1917, the judge of the Fourteenth district court in the instant case declared that ordinance void, and restrained the city and its officers from enforcing or observing it. As indicated, it is from the action in the present case that this appeal is taken. The salient provisions of the initiative ordinance necessary to be stated are these: A motor bus is defined to be any automobile, automobile truck, or trackless motor vehicle engaged in the business of carrying passengers for hire over designated streets and routes within the city of Dallas. License for such vehicles to engage in such business is authorized upon payment of a

---

⊂⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

license fee of $25 for each car so engaged, and a fee of $10 for each operator, and provides for the employment of an automobile inspector who is required to inspect and certify the car to be safe before license may issue. Licenses may not issue to an applicant until he has contributed $50 to, a fund intended to indemnify persons negligently injured by such busses while operated by licensees, and until said fund reaches $5,000. Busses may, in a limited way, detour from fixed routes of service for the convenience of passengers. Licensees are compelled to operate over their designated routes only for a period of 8 hours in 24, though they may voluntarily operate continuously. They are not required to operate on Sundays. Licensees are subjected to examinations concerning their physical fitness. Licenses may be transferred. Speed and number of passengers are regulated, and provision is made for remodeling cars in order to increase the seating capacity. Passengers may occupy rear doors when safe fastenings are provided. They may not occupy running boards. Fare shall be 5 cents between termini. Violation of the provisions of the ordinance is declared a misdemeanor punishable by fine of not less than $1, nor more than $50. The indemnity fund is created by requiring each licensee to contribute thereto $50 before his license is issued. The fund is required never to be less than $5,000. It is not required to be more. If it reaches the sum of $25,000 it shall never be less, but if it exceeds the latter sum the surplus may be returned to those entitled to it under the act. Any person injured while upon a licensed jitney operated by a licensee while upon his designated route, may, when his claim is established in a court of competent jurisdiction, recover as much as $2,500 from said fund, if it cannot be made from the defendant, upon motion thereafter to be filed in court. If the indemnity provision shall be declared invalid, other provisions of the ordinance are nevertheless to be in force, and licenses shall issue upon compliance therewith. Any other facts necessary to be stated will be referred to in our discussion of the issues presented in the brief. Nor will we discuss seriatim the points presented by counsel, but, in lieu, discuss as such the issues raised.

Accordingly, the first issue to be considered is that which challenges appellees' right to maintain the suit on the ground that appellees have no interest in the subject-matter thereof. Appellees' reply to the contention is that a corporation lawfully authorized by a municipality to use its streets as a common carrier of passengers has such an interest therein as enables it to complain of competitors illegally using same. In connection with the contentions noted, it is shown by the record that appellees are private corporations authorized to and which are operating street railways upon the streets of Dallas under authority of valid franchise grants from the city of Dallas, and by which they are required to pay the cost of paving between their rails and two feet on the outside thereof, as well as the cost of maintaining and repairing same. Each company is a large taxpayer. The motor bus referred to in the ordinances has reference, as we have said, to the jitney, which is also a common carrier of passengers in competition with appellee in the city of Dallas. The city enrolled the ordinance after its adoption by the people, and was proceeding or threatening to proceed to observe and enforce its provisions, when the suit was filed. Appellants, under the first issue, discuss, in substance, two points: (1) Appellees' want of such interest in the subject-matter as would authorize them to sue at all; and (2) conceding the interest, their right to challenge the validity of the ordinance in a suit against the city.

As to the first point "subject-matter," as applied to legal proceedings, is defined to be the "cause; the object; the thing in dispute." Bouvier. Those elements in this suit are the right of those complying with the provisions of the ordinance to engage in the jitney traffic upon the city's streets and the right of the city to enforce and observe such provisions. Have appellees any interest in that right? While the public interest, as argued by counsel, is ordinarily greatest, it is equally true that the holder of a valid franchise authorizing the use of the public streets has also an important interest therein; undoubtedly such an interest as entitles him to defend any invasion of his lawful franchise rights by the city or another. Such is obviously true of any franchise or privilege granted lawfully. Franchises, whether corporate entities or public grants, are property. Their invasion is an invasion of property rights. As a consequence, if the acts here complained of in law constitute an invasion of appellees' franchise, an interest in the subject-matter is shown. In that connection it is claimed by appellees that the ordinance is void, which brings us to the question whether it is an invasion of a valid franchise for the municipality to permit others to engage in a similar competing business under void authority. It has been decided by our Supreme Court that the owner of an unlicensed ferry, where licenses are required by law, may be restrained by his competitor, who is licensed, from engaging in the business on the ground that the licensed ferryman is entitled to protection against unlawful competition. Tugwell v. Eagle Pass Ferry Co., 74 Tex. 492, 9 S. W. 120, 13 S. W. 654. It was said in that case to be immaterial that license could issue to the unlicensed ferry, legalizing the competition, but that "it was sufficient that no such second license has in fact been issued." The most careful analysis of the holding in that case develops no more nor

less than that one lawfully conducting a ferry may enjoin a competitor from unlawfully engaging in the same business, and the fact that the state could authorize competition is immaterial in the absence of such authorization. But appellants argue, in effect, that there is a difference between one pursuing a business without any authority and one pursuing the same business under that which purports to be but is not authority. Counsel have not cited, nor have we been able to find, any case from our own courts adjudicating the precise question, that is, holding that while one lawfully upon the streets of a city may challenge the right of a competitor without any authority whatever, he may not challenge such right when the competitor is acting under color of authority. The point, however, has been decided by other courts and discussed by eminent text-writers. The cases are in conflict, while the text-writers are in agreement. Some of the cases hold, in substance, that one public utility may not challenge the authority of a rival to engage in a similar business on the ground that questions relating to the regularity of charters and the validity of franchises are to be challenged alone by constituted public authority. The leading case announcing such rule is Baxter Teleph. Co. v. Cherokee Co. Mut. Teleph. Ass'n, 94 Kan. 159, 146 Pac. 324, L. R. A. 1916B, 1083. The precise holding in that case is that while the laws of Kansas require the Cherokee County Mutual Telephone Association to secure a license from the state Public Utilities Commission, which it had failed to do, yet its rival, Baxter Telephone Company, could not on that ground challenge its right to engage in a competing business. It will be observed that such holding is in direct conflict with Tugwell's Case, supra. The court in the Kansas case argues as reason for its holding that the Public Utilities Commission might, in the exercise of its discretion, grant the permit, and if it did it would affect appellant in precisely the same manner that it would without such permit, that is to say, competition would be just as sharp under license. The court also bottoms its holding on the broader ground that the occupancy or usurpation of public streets is a public matter for the protection of which the state or its agencies only are entitled to act. In Coffeyville Min. & Gas Co. v. Citizens' Nat. Gas & Min. Co., 55 Kan. 173, 40 Pac. 326, the same court declared that one public service corporation authorized to use the streets and public grounds of a municipality was without standing in court to test the right of a rival concern to use the streets for similar purpose, or the validity of the ordinances under which the rival was acting. The court based its holding on the ground that the use of the city streets was a public question, and that the validity of grants thereon was a matter for the attention of the proper public officers. Market Street Ry. Co. v. Central

R. Co., 51 Cal. 583, holds, without discussion, that a street railway company licensed to occupy a street may not challenge the right of another unlicensed street railway company to similarly occupy the street. This case, it will be observed, is also in conflict with the Tugwell Case. In the case of Memphis St. Ry. Co. v. Rapid Transit Co., 133 Tenn. 99, 179 S. W. 635, L. R. A. 1916B, 1143, Ann. Cas. 1917C, 1045, the Kansas cases were cited and adopted without discussion, other than the statement that questions concerning the regularity of charters and the validity of franchises are to be determined at the suit of public officials and not of a competing corporation. Other cases in analysis hold that the right to use public streets depends upon legislative grant, and that the use thereof by public utilities without authority is a public nuisance, generally to be challenged by state or other public authority, but that an abutter, when he sustains special and peculiar damage, and the grantee of a valid but not exclusive franchise, may in equity challenge and ultimately restrain such use. Bartlesville Elec. Light & Power Co. v. Bartlesville Interurban Ry. Co., 26 Okl. 453, 109 Pac. 228, 29 L. R. A. (N. S.) 77, is a well-considered case supporting the rule stated. In that case the appellant sought to restrain appellee, who was without any authority, from using the city streets in competition with appellant. Injunction was denied and appeal taken. On appeal it was not claimed that any injury to or interference with appellant's plant or property would result from appellee's use of the streets. The sole complaint was that the use of the streets without authority from the city would be an encroachment upon appellant's lawful right to use the streets as evidenced by its franchise. The Kansas cases were reviewed and declared to be supported by neither the better reason nor the weight of authority. It was said to be the general rule that relief in such cases does not depend upon the right to exclusively occupy the streets in the sense that others may not be permitted to do so, but upon a lawful grant to enter thereon, and that as a result one who is lawfully upon the streets possesses against one without like authority and exclusive franchise. The court in that case asserts that while the appellant had no exclusive franchise from the city to occupy its streets, and while the city had the right to grant similar franchises to others, yet the right of such others to use its streets was dependent upon the consent of the city, and when appellee entered upon the streets of the city without such consent it was not only guilty of maintaining a public nuisance, but inflicted upon appellant a special injury which could be restrained. The foregoing case, it will be observed, is one where there was an absence of any authority, as in the Tugwell Case, in fact that case is cited in support of the holding. Later, the case of Tulsa St. Rail-

way Co. v. Oklahoma Union Traction Co., 27 Okl. 339, 113 Pac. 180, involving the precise question involved in the instant case, reached the Oklahoma Supreme Court. In that case the traction company was the holder of a franchise lawfully granted, permitting it to use the streets of Tulsa. It sued the street railway company to restrain it from building a parallel and competing line of railway on the ground that the street railway company was without franchise or other legal authority to do so. The street railway company answered that it did possess a franchise authorizing its proposed action. The traction company replied that if the street railway company did possess such franchise it was void, because the city was without authority to grant it, to which the latter answered that in such proceeding the validity of its franchise could not be questioned, since such issue could only be raised by the governing authority. In passing on the case the court notes that a similar question was decided in Bartlesville Elec. Light & Power Co. v. Bartlesville Interurban Ry. Co., but says that it is claimed the case is not ruled thereby, because of a difference in facts requiring the application of a different rule, and states the difference in the facts to be that in the first case an entire absence of authority to use the streets was admitted, leaving no issue of fact or law to be determined in order to ascertain if the company was a trespasser upon the streets. The court, however, declares nevertheless that whether one is a trespasser upon public streets may be either an issue of fact or of law, both of which may be determined in a proceeding in equity. The court then refers to and approves the former holding that one with a lawful franchise has the exclusive right to exercise privileges granted thereby as against one who has not a similar lawful franchise, and adds that such privilege is private property, which may be protected against public nuisances, and that the court may investigate the facts and determine whether the defendant company has a franchise, and, if it has a pretended franchise, may determine whether such franchise is invalid because granted without authority of law.

Allen v. Clausen, 114 Wis. 244, 90 N. W. 181, was a suit in which Allen, who owned property abutting upon a public street in Kenosha, among other matters, sought to enjoin Clausen from building a street railway on such street on the ground that the grant of the right by the city was without authority. Any inquiry into the validity of the franchise was objected to on the ground that a court of equity could not make such inquiry at the suit of a private individual, but only in a proceeding in the nature of quo warranto by the state. The court holds that "where one attempts to justify acts by a pretended license or franchise which the grantor had no power whatever to confer, a court, whether of law or equity," can dis-

cover that fact and deny the claim of justification, and it is immaterial whether the lack of power lies in the state or its agencies. Many cases are cited in support of the rule announced.

In Millville Gaslight Co. v. Vineland Light & Power Co., 72 N. J. Eq. 305, 65 Atl. 504, it was said, in substance, that legislative franchises, however granted, are necessarily exclusive against all persons upon whom similar rights have not been conferred, since the exercise of such rights, without authority, is both usurpation of power and an invasion of the private rights of those upon whom franchises have been conferred. For the protection of such rights, so inadequate is the law, equity will extend its protective writ, even though it bring into question the validity of the franchise grants. In support of the rule other equity cases are cited.

In the case of Atlanta Ry. & Power Co. v. Atlanta Rapid Transit Co., 113 Ga. 481, 39 S. E. 12, it was held that the validity of a city ordinance in a contest between rival companies could be challenged and its enforcement restrained, if granted without authority. In State ex rel. Morgan's Louisiana & Texas R. & S. Co. v. Judge of Division A, Civil District Court, 52 La. Ann. 1065, 27 South. 580, it was held that a similar proceeding could be maintained by any taxpaying citizen.

It is said that:

"The grantee of a valid franchise, according to what seems to be the better rule, may enjoin interference with its property rights by a competitor which has not obtained a valid grant of the right to use the streets." McQuillin, Mun. Corp. vol. 4, § 1771.

A similar declaration is found in Dillon, Mun. Corp. (5th Ed.) § 1771, with a broader discussion of the fundamentals of the rule.

[1] We have not reviewed every case which by analogy or otherwise supports the right to contest in a proceeding in equity the validity of legislative grants under facts similar to those disclosed in the instant case, but those we have discussed very clearly disclose that they are based on principles of equity, that is to say, upon principles of fairness, justness, and right dealing, as that rule is understood, and since our inquiry is more precisely the right to maintain the suit, rather than a discussion of why it may or may not be maintained, any lengthy discussion of the reasons for the rule is unnecessary, if the right exists. One of the cases cited, however, declares that unlawful competition is denied because it would be to permit one to unlawfully take from another a portion of the latter's business without any corresponding obligation to the city whose streets are being used. Our own Supreme Court says in the Tugwell Case that it is so because lawful business is entitled to protection against unlawful competition, which it occurs to us is a sufficient answer alone. While, as we have just said, the cases reviewed sustain the right to maintain such suits on equitable

principles, the contrary holdings not only do not deny the right on equitable grounds, or on the ground that unlawful business may not be prevented, but on the ground in the last analysis that the right to proceed is in public officers, and whether they do proceed is with them to some extent at least a matter of discretion, even though such failure might injure another in his private property rights, which is but to say that all relief would be denied, since those charged with the performance of public duties are not expected to protect private interests.

It is thus obvious that not only the current of authority, but the better reason as well, supports the right to challenge such grants as we have been discussing in the manner done in this suit, in fact we are unable to escape the fact that the Tugwell Case is controlling. We accordingly hold that there was no error in the action of the district judge in holding that appellees were entitled to maintain this suit on the ground that they were interested in the subject-matter.

[2] As relates to the other point, that is, the right to proceed against the city for the purpose of declaring invalid a legislative grant, we conclude that right manifestly exists in equity, and rests, as said by another, "on the firm and satisfactory ground of its necessity to avoid a ruinous multiplicity of suits, and to give adequate protection to plaintiff's property in its franchise." Pomeroy's Eq. Juris. vol. 6, §§ 583, 584. While most of the reported cases are suits between individuals or corporations, municipalities are none the less subject to the rule, since they may sue and be sued in the same manner that individuals or private corporations may sue and be sued, and whether, in equitable proceedings like the instant one, they are necessary or proper parties, and may be sued in order to avoid a multiplicity of suits, depends upon the exigencies disclosed by the facts. To maintain an effective suit against the jitneys authorized to operate under the ordinance in suit would truly require a ruinous multiplicity of suits. Under the ordinance any number of licensees who cared to do so could engage in the business. Licenses can be issued at any time and as often as those desiring them comply with the terms of the ordinance. Licensees may also sell and transfer their licenses and re-enter the business intermittently. Obviously, it might take a great number of suits to proceed directly against the licensees. After suit is brought others could enter the business, which would require suits against them. Those actually sued could sell or transfer their license, rendering any judgment against them ineffective. Even after decree there would be nothing to prevent the city from issuing licenses to others not parties thereto. Even if it be assumed that the city would suspend enforcement of the ordinance after restraint of those licensed thereunder, such fact would not afford ground for denying appellees the relief sought, as will appear from the case cited next below.

[3] Further, no jitney had been licensed to operate under the ordinance attacked, and it was to enjoin its threatened enforcement that this suit was commenced. That this may be done in a suit directly against the municipality is, we believe, established in City of Austin v. Austin City Cemetery Ass'n, 87 Tex. 330, 28 S. W. 528, 47 Am. St. Rep. 114. The precise holding in that case was that one whose business was injuriously threatened by city ordinance could in a direct proceeding against the city test the validity and enjoin the enforcement thereof, even though the city was not attempting to enforce same, and even though the effort of such relief was to enjoin criminal prosecutions, which usually may or should be prevented by resort to habeas corpus. There, the act consisted in unlawfully interfering with plaintiff's business. Here, the act complained of is the granting to another of colorable authority to do the same thing. It occurs to us that either act inevitably imports the same thing. As a consequence, we conclude the authority cited is also authority for maintaining the suit, aside from the equity rule as announced by Mr. Pomeroy.

[4] The next issue to be considered is that which challenges the holding of the trial court that the Legislature has not conferred upon the electorate for their determination under the initiative and referendum provisions of the charter, the matters comprehended by the ordinance under discussion, but that such authority is reserved to the mayor and board of commissioners. It is hardly necessary for us to repeat here, in reference to this oft-recurring question, the statement iterated and reiterated in all judicial decisions that except in the particulars wherein it is restrained by the federal Constitution the Legislature may exercise all legislative power not forbidden, expressly or by implication, by the state Constitution. A corollary of such rule necessarily is that municipalities or other legislative instrumentalities or agencies may exercise only such legislative powers as are in turn, expressly or by implication, delegated to them by the Legislature. The inquiry then is, Did the Legislature by the charter granted to the city of Dallas authorize the voters to enact the ordinance complained of, or did it authorize the board of commissioners to do so? As indicated, it may be exercised only by the agency chosen. The determination of that issue does not involve the construction of complicated legal questions, but solely the ordinary signification to be attached to the language used in the charter. In determining that question, however, we expressly pretermit any discussion of whether the Legislature could or could not delegate such power to the electorate, but confine ourselves

to a discussion of where the power in the charter lies as between the electorate and the board of commissioners of the city and nothing more.

[5] The charter grant to the city has many provisions, but we shall attempt to recite only the substance of those material to the issue stated. By article 3, sub. 1, it is declared that all powers conferred on the city shall be exercised by a mayor and board of four commissioners, unless otherwise directed. By article 2, § 8, sub. 7, the city has the right, acting through its board of commissioners, to determine, fix, and regulate the charges, fares, or rates of franchise holders or those exercising any other public privilege, and to prescribe the service to be rendered and alter and change same, and in connection with which the board is required to make rules for a fair hearing to those to be affected, and no change shall be made until after notice and fair hearing. By article 2, § 8, sub. 27, the city has the power by ordinance to fix and regulate, among other things, the fares, tolls, and charges of public carriers and hacks, whether transporting passengers, freight, or baggage, and generally to fix and regulate the rates, tolls, or charges and the kind of service of public utilities of every kind. By article 8, § 1, any proposed ordinance may be submitted to the board of commissioners by registered electors of the city under certain regulations, and if found to be in compliance with the initiative provisions of the charter shall be by the board referred without alteration to the electorate, and if adopted by a majority of the voters shall become a valid and binding ordinance of the city and may not be amended or repealed save by a vote of the people. The ordinance here involved, the salient points of which we have detailed, we assume, for the immediate discussion, to have been adopted in conformity with all provisions of the charter, which we have not stated because immaterial in view of the conclusion we have reached. In Southwestern Tel. & Tel. Co. v. City of Dallas, 104 Tex. 114, 134 S. W. 321, it was held under the provisions which we have enumerated, now in the city charter without change, that the tolls to be charged by the telephone company and the maturity and manner of their collection could not be regulated under the initiative and referendum provisions contained in the charter, for the reason that the right to regulate such matters was by the charter reposed in the board of commissioners, who were required to give notice and fair hearing to those to be affected, and because such fair hearing obviously could not be had "in a campaign before the electorate of the city." Appellants' contention in the instant case, as disclosed by supplemental briefs, is, in substance, that the right of the board of commissioners to fix the rates and regulate the service to be given by public utilities extends only to such concerns as operate under franchises as defined in the city charter, and that hence the case cited is without application. It is true that that portion of the charter which expressly reserves to the commission the right to determine, fix, and regulate charges of public utilities, and prescribe the kind and manner of service to be rendered, is found in that portion referring to, defining, and regulating franchise grants by the city, and while it is true that we conclude, for reasons stated in City of Dallas v. Gill et al., 199 S. W. 1144, this day determined, that the ordinance in this proceeding is not a franchise as defined in the charter, we nevertheless conclude that the power to enact the ordinance was alone in the board of commissioners. The subdivision which is controlling being subdivision 7, of section 8, article 2, confers upon the board not only authority to determine, fix, and regulate the charges and the service to be rendered by those that do or may enjoy a franchise, but to similarly determine, fix, and regulate the charges and the service to be rendered by any person, firm, or corporation who does or may exercise any other public privilege in said city. It is manifest that it was the intention of the Legislature and that the language used does distinguish between a franchise and a public privilege. The books make a distinction.

"In American law a franchise is defined as a special privilege conferred by the government on individuals and corporations, and which does not belong to the citizens of a country generally by common right. * * * The term franchise includes the term privileges, but a privilege is not necessarily a franchise." McQuillin, Mun. Corp. vol. 4, § 1614, p. 3360.

As said at another point, a franchise is property, or, as said by the writer just quoted, "an incorporeal hereditament." The right to use the streets under the ordinance in question is at most, we believe, a permissive privilege. Certainly, it is not as is a franchise a vested property right. As a consequence, the section not only reserves to the commissioners the right to pass all regulatory ordinances affecting franchise holders, but to pass all such ordinances affecting those exercising any other public privilege. To hold less would be to construe as meaningless the term "public privilege."

Further, it is declared in the telephone case, supra, that the authority conferred by subdivisions 7 and 27 of section 8 of article 2, of the charter, is to be exercised only by the board of commissioners. The language used is that:

"There can be no doubt that the authority to so regulate the business named in said sections may be exercised by the board of commissioners."

Thus to the board of commissioners it appears is reserved all the power conferred by said sections. That power as contained in section 7 is, in substance, to pass all ordinances fixing and regulating the charges,

fares, or rates of those enjoying a franchise or other public privilege. Such power as contained in section 27 is, in substance, to pass all ordinances fixing and regulating the price of water, gas, and electric lights, and the fares, tolls, and charges of local telephones, of public carriers and hacks, whether transporting passengers, freight, or baggage, and generally to fix and regulate the rates, tolls, charges, and service "of all public utilities of every kind." It would seem idle to argue that the vehicles described in the ordinance under discussion are not included in the sweeping provisions of the two sections. The licensees in using them upon the public streets as carriers of passengers are certainly exercising that character of public privilege referred to in subdivision 7. They are certainly public utilities and public carriers as described in section 27.

For obvious reasons we have refrained from any discussion of the policy of granting or denying to the electorate the powers claimed in this proceeding. That is a political question for determination by the Legislature. We have confined ourselves solely to a construction of the grant, and conclude from the language used and the construction placed thereon by the Supreme Court that the powers attempted to be exercised by the voters were reserved by the Legislature to the board of commissioners, and that as a consequence the ordinance is void.

The judgment is affirmed.