716 A.2d 1042

BALTIMORE STEAM COMPANY t/a Trigen–
Baltimore Energy Corporation

v.

BALTIMORE GAS & ELECTRIC COMPANY, et al.

No. 1534, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Aug. 31, 1998.

2

4

**6**

John T. Prisbe (Thomas P. Perkins, III, Emried D. Cole, Jr., Venable, Baetjer and Howard, LLP on the brief) Baltimore, for appellant.

Marc K. Sloane (Ronald D. Byrd, David M. Perlman and Paul W. Davis on the brief) Baltimore, for appellees, BG&E and Comfort Link.

Otho M. Thompson, City Solicitor and Burton H. Levin, Principal Counsel on the brief, Baltimore, for appellee, Mayor and City Council of Baltimore.

Before HOLLANDER, THIEME and KENNEY, JJ.

THIEME, Judge.

Appellant Baltimore Steam Company, doing business as Trigen–Baltimore Energy Corporation (hereinafter referred to as "Trigen"), appeals from an order of the Circuit Court for Baltimore City dismissing Trigen's declaratory judgment action for lack of standing. Trigen's complaint requested injunctive relief and a declaration (1) that the franchise granted by Baltimore City (the City) to the Baltimore Gas & Electric Company (BGE) was invalid or in the alternative (2) that this franchise could not be exercised until its use was authorized by the Maryland Public Service Commission (PSC). The action was primarily directed against BGE and its affiliate, the District Chilled Water Limited Partnership (hereinafter referred to by its commercial name, "Comfort Link"), but because the complaint necessarily called into question the validi-

ty of the city ordinance that purported to grant BGE a franchise, the City was also made a party as required by Md.Code Ann., Cts. & Jud. Proc. § 3–405(b) (1995 Repl.Vol.). BGE, the City, and Comfort Link, appellees, all moved to dismiss the action, arguing *inter alia* that Trigen lacked standing. After a hearing, the court dismissed the complaint on standing grounds and denied Trigen leave to amend. Within ten days, Trigen moved for clarification and reconsideration, which motion was denied. Trigen timely filed its notice of appeal within thirty days after the docketing of that denial. We have recast the question presented as follows:

> Does appellant, as holder of a non-exclusive franchise, have standing to challenge the validity of a competitor's non-exclusive franchise or to force such a competitor to comply with the preauthorization requirements of the Maryland Public Service Commission Law?

## I.

Trigen operates a steam heating business in Baltimore City, and this enterprise involves transmitting steam through pipelines under the city streets. Trigen has obtained from the City a franchise granting Trigen the City's permission "to construct, lay, operate and maintain" an underground pipeline system within a designated portion of the downtown area "for the purpose of transmitting heat or refrigeration, or both." Trigen's franchise additionally authorizes use of public streets for connecting any building within the designated area to this pipeline system. This franchise was granted *via* City Ordinance No. 171, approved on 29 June 1984. As a matter of purely historical interest, this grant roughly coincides with Trigen's purchase of an existing underground steam pipeline system from BGE, Trigen's present rival. There is no dispute that Trigen's franchise is non-exclusive, *i.e.*, it does not purport to prevent the City from granting similar franchises to other entities. In fact, the ordinance states:

> [N]othing in this ordinance shall be construed to give to the said Grantee, its successors and assigns, an exclusive right to occupy any of the streets, lanes or alleys embraced in and

covered by the terms of this ordinance, nor to prevent the Mayor and City Council of Baltimore from granting similar privileges to any other person or company, nor to prevent the Mayor and City Council of Baltimore from granting to such other person or company the privilege of laying subways, pipe lines, ducts or conduits in juxtaposition to those embraced in this ordinance.

In 1984, BGE ceased operations of its steam heating business and consequently forfeited the franchise under which it had previously enjoyed the right to transmit steam beneath the city streets. In 1995, BGE decided to reenter this heating market and incorporated Comfort Link for that purpose.[1] BGE applied for a new franchise, and the proposed franchise was introduced before the City Council as Council Bill 1295. Trigen addressed the City Council at a hearing on the bill and requested certain amendments and deletions. Bill 1295 was eventually passed and became Ordinance No. 624, signed by the Mayor on 29 November 1995.

The franchise that was granted to BGE is similar to the one previously granted to Trigen. It authorizes BGE "to construct, lay, operate and maintain subways and pipe lines ... for the purpose of transmitting heat or refrigeration, or both." BGE's franchise, like Trigen's, is also indisputably non-exclusive. The geographical boundaries of the two franchises differ somewhat, but they basically cover the same areas of downtown Baltimore. BGE formally accepted its franchise in a letter of 12 April 1996.

The catalyst for the instant suit was a steam heating bid request issued by the University of Maryland Medical System. The Medical System published a "Request for Proposal to Provide Steam and Chilled Water" in 1996, and Comfort Link submitted a proposal for such services in late March 1997. Trigen responded swiftly by filing this four-count declaratory judgment action on 24 March 1997.

---

1. BGE is the majority owner of Comfort Link, with a sixty percent ownership interest. *Monumental Investments* owns the other forty percent.

In Count One, Trigen sought a declaration that Ordinance No. 624 was invalid for failure to comply with two different procedural requirements of Article VIII (governing franchise grants) of the Baltimore City Charter. Specifically, Trigen alleged that the City Council had failed to advertise the proposed franchise grant for three days in a daily newspaper, Baltimore City, Md. Charter, art VIII, § 6, and that the proposed franchise had not been valued by the Board of Estimates for purposes of obtaining maximum compensation from the franchisee. *Id.* at § 2. Count Two sought a declaration that the franchise granted by Ordinance No. 624 cannot be exercised or otherwise acted upon without first obtaining authorization from the PSC, as required both by § 13 of the Ordinance and by the Maryland Public Service Commission Law (MPSCL). Section 13 of the Ordinance authorized BGE to charge such sums for its services "as may be established by, and subject to the jurisdiction of, the Public Service Commission, if any." The MPSCL requires all "public service companies" to obtain prior authorization from the PSC before exercising, assigning, or transferring any franchise. Md. Ann. Code art. 78, § 24 (1998 Repl.Vol.). (Trigen alleged that since Comfort Link was purporting to exercise a franchise that was granted solely to BGE, an assignment or transfer must have occurred.) Count Three sought a declaration of the invalidity of Ordinance No. 624 on the alternate rationale that, assuming that PSC authorization is not required, then the ordinance is invalid for failure to set forth the rates at which customers will be charged, a mandatory term according to the Charter, art. VIII, § 2. Count Four requested an injunction against any competition from BGE/Comfort Link and other relief based on all of the foregoing counts.

Appellees moved the circuit court to dismiss the case on several grounds, one of which was that Trigen lacked standing to bring the action. At the conclusion of the hearing on the issue of standing on 18 June 1997, the court ruled that Trigen lacked standing and ordered the entire case dismissed.

## II.

■ Some preliminary matters must be resolved before addressing the central issues. To begin with, appellees BGE and Comfort Link have moved to dismiss this appeal on the grounds that Trigen has previously taken a position that is inconsistent with its right to appeal. The motion is premised on the principle that "[t]he right to appeal may be lost by acquiescence in, or recognition of, the validity of the decision below from which the appeal is taken or by otherwise taking a position which is inconsistent with the right of appeal." *Banegura v. Taylor*, 312 Md. 609, 615, 541 A.2d 969, 972 (1988) (quoting *Rocks v. Brosius*, 241 Md. 612, 630, 217 A.2d 531, 541 (1966)). Stated another way, "[A] voluntary act of a party which is inconsistent with the assignment of errors on appeal normally precludes that party from obtaining appellate review." *Id.* (quoting *Franzen v. Dubinok*, 290 Md. 65, 69, 427 A.2d 1002, 1004 (1981)).

■ At the hearing before the circuit court, the arguments focused mostly on standing to challenge the validity of the franchise ordinance and much less so on standing to enjoin a violation of the MPSCL. The court orally ruled that Trigen had no standing to challenge the validity of the ordinance. As previously noted, the court then dismissed the complaint and denied leave to amend, and Trigen responded with a Motion for Clarification and Reconsideration. The desired clarification pertained to whether the court had also ruled on standing to enforce the MPSCL. The request for reconsideration concerned the court's denial of leave to amend, as Trigen argued that it could assert other bases for standing which would not call into question the validity of Ordinance No. 624. In reply to the City's response to this motion, counsel for Trigen filed a letter pleading dated 8 July 1997. The letter stated:

> The City's Opposition asserts and is premised upon the mischaracterization that "[Trigen] challenges the validity of a franchise ordinance enacted by the City." This is patently wrong. For purposes of amending its complaint, Trigen

would assume that the enactment of Ordinance No. 624 *is valid.* Trigen still has legal claims that can be asserted based on BGE's failure to comply with the ordinance.

(Emphasis in original.) (Citation omitted.) BGE and Comfort Link now allege that these statements constitute "a clear acquiescence in the decision by [the court] that Trigen lacks standing to challenge the subject ordinance," and that Trigen has thereby lost its right to appeal any issue pertaining to the validity of Ordinance No. 624.

We do not agree. By its context and its very words, the import of the above passage is limited to "purposes of amending [Trigen's] complaint." The type of argument signified by this language is a common one, whereby a party concedes a preliminary point for purposes of argument only, in order to demonstrate how that party would still win an ultimate victory on a secondary point. In so specifying the purposes for which the preliminary point is conceded, the party is reserving the right to contest the issue in another context and is not acquiescing in or conceding the point generally. The technique is so common that we wonder at BGE's and Comfort Link's misreading of the significance of the quoted passage. Having fought and lost on the issue of standing to challenge the validity of Ordinance No. 624, Trigen had already preserved its appeal with regard to that issue and was merely attempting to ensure that its other arguments were addressed as well. Nothing about Trigen's post-judgment motion is inconsistent with its right to appeal the ruling against it. We also note that it usually takes far more than a post-judgment argument for a party to lose the right to appellate review. The motion of BGE and Comfort Link to dismiss the appeal is denied.

 Since the appeal itself arises from a motion to dismiss, "we assume the truth of all relevant and material well-pled facts, as well as all the inferences that could reasonably be drawn from those facts, in the light most favorable to appellant." *Ferguson v. Cramer,* 116 Md.App. 99, 103, 695 A.2d 603, 605 (1997). We may only consider those allegations

set forth in the complaint. *Frericks v. General Motors Corp.*, 274 Md. 288, 303, 336 A.2d 118, 127 (1975). As the issue in this case is a party's standing to be heard in court, it is especially important to note that we will at no point be reviewing the merits of Trigen's case. *See Sugarloaf Citizens' Ass'n v. Department of Env't*, 344 Md. 271, 295, 686 A.2d 605, 617 (1996) ("[S]tanding to challenge governmental action, and the merits of the challenge, are separate and distinct issues."). Our review is confined solely to matters of law, based on the facts as alleged in Trigen's complaint.

 BGE and Comfort Link would have us apply a more searching standard of review, as they argue that we may reject some allegations in the complaint which are "patently false." We find no support for such a proposition in the law of this state. It is true that we need not consider wholly conclusory charges that have no factual support, *Berman v. Karvounis*, 308 Md. 259, 265, 518 A.2d 726, 728–29 (1987), and that we may even construe ambiguities in the complaint against the pleader. *Ronald M. Sharrow, Chtd. v. State Farm Mut. Auto. Ins. Co.*, 306 Md. 754, 768, 511 A.2d 492, 500 (1986). We cannot, however, resolve a factual dispute in the first instance, regardless of how conclusive the evidence may be. Md. Rule 8–131(a); *Harrell v. Sea Colony, Inc.*, 35 Md.App. 300, 308, 370 A.2d 119, 124 (1977). BGE and Comfort Link argue that Trigen cannot allege particular facts contradicting a prior determination by the PSC that its authorization is not required with regard to the exercise of the franchise at issue.[2] We believe this issue properly sounds in preclusion or perhaps administrative exclusivity, neither of which has been argued here or decided below. The issue also relies on factual matters beyond the complaint and thus is

---

2. The record contains only the scantiest details of these collateral proceedings. The parties seem to agree that the PSC's decision was affirmed by the Circuit Court for Baltimore City subsequent to the hearing at issue. Trigen plays down the effect of these prior proceedings by alleging that the court's affirmance was on ripeness grounds. We are simply not in a position to engage in any meaningful review of the PSC's actions.

properly raised in a motion for summary judgment, not a motion to dismiss. *Lusby v. Baltimore Transit Co.*, 199 Md. 283, 285, 86 A.2d 407, 408 (1952). The court was very careful to note that it took into consideration no matters beyond the pleadings, so there is no basis for recasting its ruling as a grant of summary judgment. Since the lower court never took into consideration the effect of any prior proceedings before the PSC, neither shall we.

 Finally, Trigen has presented us with two alternate bases for standing not pled in the complaint: taxpayer standing and standing to sue for tortious interference with economic and business relationships. These same bases were also proffered to the lower court in Trigen's motion for reconsideration of that court's denial of leave to amend the complaint. In order to address these alternate bases we would first have to reverse the lower court's denial of leave to amend, and such a ruling may only be reversed for abuse of discretion. *Downs v. Roman Catholic Archbishop*, 111 Md.App. 616, 626, 683 A.2d 808, 813 (1996). Trigen has not even attempted to argue that the lower court abused its discretion in denying leave to amend, and we will not speculate as to why these alternate bases were not pled in the first instance. Trigen's standing must therefore be determined solely according to the complaint.

### III.

The matter before us is simply a dispute over whether Trigen has standing, yet the ease with which the problem can be stated belies its complexity. There are in fact two questions of standing before us, as Trigen's complaint seeks both to challenge the validity of a competitor's franchise and to enjoin a violation of the MPSCL. Trigen has argued its case primarily through citation of precedent, contending that the Court of Appeals and other authorities recognize a franchisee's standing to challenge the validity of a competitor's franchise and to seek an injunction barring a competitor from exercising its franchise without first obtaining necessary au-

thorizations from the appropriate regulatory bodies. The City adopts a similar strategy, albeit in opposition, by proposing that we follow *KAKE–TV and Radio, Inc. v. City of Wichita*, 213 Kan. 537, 516 P.2d 929 (1973), in which the Supreme Court of Kansas rejected the plaintiff's standing to challenge the validity of a competitor's franchise. BGE and Comfort Link, on the other hand, have taken a more doctrinal approach. While they certainly contest Trigen's interpretation of precedent and join the City in support of the Kansas case, BGE and Comfort Link propose that the reason Trigen has no standing is because its interests in the instant suit are not within the "zone of interests" contemplated by any of the various provisions of law Trigen seeks to enforce. As we shall soon discuss, these various approaches also signify differing views on how a party attains standing.

We begin our approach with the basic prerequisites of a declaratory judgment. The Maryland Uniform Declaratory Judgments Act authorizes a court to grant such judgment if:

it will serve to terminate the uncertainty or controversy giving rise to the proceeding, and if:

(1) An actual controversy exists between contending parties;

(2) Antagonistic claims are present between the parties involved which indicated imminent and inevitable litigation; or

(3) A party asserts a legal relation, status, right, or privilege and this is challenged or denied by an adversary party, who also has or asserts a concrete interest in it.

Md.Code Ann., Cts. & Jud. Proc. § 3–409(a). The statute is remedial in nature and is intended "to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations. It shall be liberally construed and administered." *Id.* at § 3–402. Consistent with such a broad purpose, it takes only the most basic showing of "a justiciable controversy" in order to invoke a court's jurisdiction under the Act. *Hatt v. Anderson*, 297 Md. 42, 45, 464 A.2d 1076, 1078

(1983). A justiciable controversy is present "when there are interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded." *Reyes v. Prince George's County*, 281 Md. 279, 288, 380 A.2d 12, 17 (1977).

 A declaratory judgment is not justiciable if a party lacks "standing" to bring a suit. *Citizens Planning and Hous. Ass'n. v. County Executive*, 20 Md.App. 430, 437, 316 A.2d 263, 267, *rev'd on other grounds*, 273 Md. 333, 329 A.2d 681 (1974). The doctrine of standing is that strain of justiciability focusing on the interestedness of the parties. *See Maryland State Admin. Bd. of Election Laws v. Talbot County*, 316 Md. 332, 339, 558 A.2d 724, 727 (1988). Although it is perhaps more accurate to describe standing as a collection of context-specific doctrines, the core inquiry of standing is whether a particular party has an interest that is sufficient as a matter of judicial policy to entitle that party to be heard in court. *See* Louis L. Jaffe, *Judicial Control of Administrative Action* 501–05 (1965). At the most basic level, a plaintiff's interest in the case must be legally cognizable, *i.e.*, it must be a "legal interest," which has been succinctly defined by the Supreme Court as "one of property, one arising out of a contract, one protected against tortious invasion, or one founded on a statute which confers a privilege." *Tennessee Elec. Power Co. v. Tennessee Valley Auth.*, 306 U.S. 118, 137–38, 59 S.Ct. 366, 369, 83 L.Ed. 543 (1939). This so-called "legal interest test" has been criticized in other contexts as overly conducive to blending issues of standing with the merits of the claim. *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). We refer to the test here merely as a useful road map of the various potential routes to demonstrating standing.

 The only interest Trigen has alleged in the instant case is an interest in being free from competition by BGE and/or Comfort Link. In most cases, however, such an interest is not legally cognizable and is thus insufficient to confer standing. *Cook v. Normac Corp.*, 176 Md. 394, 397–98, 4 A.2d

747, 749 (1939) ("[M]ere competition is not an evil which business men may enjoin as a wrong to them."). This is not to say that Trigen's interest is negligible or not susceptible to proof. To the contrary, we have little doubt that Trigen would suffer real financial consequences from the introduction of competition into the Baltimore steam heating market. The rule, however, is the necessary corollary of a public policy favoring competition as a source of social benefit. As the Court of Appeals has eloquently put it, in the context of explaining why tortious competition is such a narrow concept:

> " 'Iron sharpeneth iron' is ancient wisdom, and the law is in accord in favoring free competition, since ordinarily it is essential to the general welfare of society, notwithstanding competition is not altruistic but is fundamentally the play of interest against interest, and so involves the interference of the successful competitor with the interest of his unsuccessful competitor in the matter of their common rivalry. Competition is the state in which men live and is not a tort, unless the nature of the method employed is not justified by public policy, and so supplies the condition to constitute a legal wrong."

*Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 72–73, 485 A.2d 663, 676 (1984) (quoting *Goldman v. Harford Rd. Building Ass'n,* 150 Md. 677, 684, 133 A. 843, 846 (1926)). Courts are thus understandably reluctant to characterize something "essential to the general welfare" as an actionable wrong. Instead, the law considers the economic consequences of competition to be *damnum absque injuria,* or damage without legally cognizable injury. *Tennessee Elec. Power Co.,* 306 U.S. at 140, 59 S.Ct. at 370; *Macklin v. Robert Logan Assocs.,* 334 Md. 287, 303–04, 639 A.2d 112, 120 (1994) (citing *Walker v. Cronin,* 107 Mass. 555, 564 (1871)).

In *Cook,* the plaintiff owned a movie theater and sought an injunction against the construction of a rival movie theater across the street, alleging that the construction was in violation of the city building code. As already quoted above, the Court's initial response was to note that "mere competition" is not an enjoinable "evil." The plaintiff countered that, because

of the building code violations, this was not a case of "mere competition" but of "illegal competition." The Court was ultimately unswayed. It conceded that

> [c]ompetition without full compliance with the law has been enjoined at the suit of private individuals, but only under some conditions; a principle upon which the relief may be permitted seems generally agreed upon, although courts have differed in its applications. It is allowable only to preserve an exclusive privilege or advantage which the law gives, as, for instance, that to a class of persons admitted to a business or profession by reason of special qualifications for it, or those who exercise a franchise from the government.

176 Md. at 397–98, 4 A.2d at 749 (citations omitted). There was no allegation that any sort of franchise was involved, so the Court queried whether the portions of the building code at issue gave the plaintiff "an exclusive privilege."

> The court is clear that the requirements of the building code to which reference is made are concerned with fire and other hazards in a theater, and are not at all intended to confer privileges or advantages on owners of other theaters.

*Id.* at 399, 4 A.2d at 749.

Trigen's burden, then, is to demonstrate how its interest in avoiding competition is cognizable in spite of the *Cook* rule that competition generally is mere *damnum absque injuria.* This Trigen has attempted to do in two different ways, each of which was foreshadowed in *Cook* and each of which addresses a different prong of the legal interest test. First, Trigen points to the franchise in its possession and alleges that such a franchise carries with it a right in the nature of a property right to be free from any illegal and unauthorized competition from BGE and Comfort Link. The *Cook* Court itself suggested that a franchise might confer standing to enjoin competition, and this will be our first area of inquiry below.

Second, Trigen resurrects the argument that what it seeks to enjoin is not "mere competition" but "illegal

competition," since BGE and Comfort Link are allegedly violating various provisions of law, most notably the MPSCL. As *Cook* demonstrates, however, the fact that competition is contrary to law does not by itself confer standing on a competitor. A ready explanation of why this is so may be found by referring to the rules of standing applicable to so-called "public rights" cases. Ordinarily, only the public authorities have standing to seek redress for violations of the public laws, and a private individual has standing to do so only when she can show that she has " 'suffered some special damage [read "injury"] from such wrong differing in character and kind from that suffered by the general public.' " *Becker v. Litty*, 318 Md. 76, 92–93, 566 A.2d 1101, 1109 (1989) (quoting *Weinberg v. Kracke*, 189 Md. 275, 280, 55 A.2d 797, 799 (1947)). A competitor's interest in avoiding competition will frequently be "special" enough to satisfy this rule, but the fact yet remains that competition results in no "injury" at all.

■ In order for an individual to have standing to seek an injunction against a market competitor's violations of the law, the law allegedly violated must be one that protects the individual's interest in avoiding competition. *Cook*, 176 Md. at 399, 4 A.2d at 749 (rejecting standing on the grounds that "the requirements of the building code to which reference is made ... are not at all intended to confer privileges or advantages on owners of other theaters"); *see also Kreatchman v. Ramsburg*, 224 Md. 209, 222, 167 A.2d 345, 352 (1961) (a competitor cannot appeal a zoning decree allowing the construction of a rival store because "competition is not a proper element of zoning"); *Baltimore Retail Liquor Package Stores Ass'n v. Board of License Comm'rs*, 171 Md. 426, 429, 189 A. 209, 210 (1936) (liquor licensees have no standing to compel the revocation of their competitors' licenses that were allegedly improperly renewed because, *inter alia*, "it was not within the purpose of the [licensing] statute to restrict competition for the benefit of any licensee"). *Compare Thomas v. Howard County*, 261 Md. 422, 430, 276 A.2d 49, 53 (1971) (plumbers

found to have standing as taxpayers to compel the enforcement of plumbing licensing laws; no need to discuss standing based on competitive injury). *But see Dart Drug v. Hechinger Co.*, 272 Md. 15, 24, 320 A.2d 266, 271 (1974).[3] Only under these special circumstances can it be said both that the plaintiff asserts a legal interest "conferred by a statute" and that the plaintiff would be "specially 'injured' " by the alleged statutory violation. If necessary, this will be our second topic of discussion below.

---

**3.** In *Dart Drug*, the Court of Appeals without explanation reached a result that appears contrary to *Cook* and its progeny. In that case, Hechinger hardware and lumber store believed that the local Sunday closing law was being unevenly enforced, and it brought an action against three rival drug stores for declaratory and injunctive relief. While Hechinger had been forced to shut down on Sundays, the drug stores (which allegedly sold about two-thirds of the same products as were sold by Hechinger) were allowed to stay open under a statutory exception for stores "whose basic business is the sale of drugs and related items." The lower court found the exception to be unconstitutional and enjoined the drug stores from staying open on Sundays. The Court of Appeals reversed as to constitutionality. The drug stores argued in their appeal that Hechinger lacked standing to enjoin competitors since the Sunday closing law in no way related to competition, but the Court brushed aside such concerns:

The answer to these arguments [that Hechinger has no standing] is that while it is generally true that a private person cannot enforce a criminal statute without a showing that it was passed for his benefit, *Cook v. Normac Corp.*, 176 Md. 394, 398, 4 A.2d 747, 749 (1939), it is equally true that the mere fact that a course of action is a crime will not prevent equity from dealing with it, if it causes the complainant harm for which there is no legal remedy, *Dvorine v. Castelberg Jewelry Corp.*, 170 Md. 661, 668, 185 A. 562, 565 (1936). In fact, there are cases where the imposition of a criminal sanction may be less effective and complete than injunctive relief, and equity will act, *State v. Ficker*, 266 Md. 500, 508, 295 A.2d 231, 235–36 (1972). *See generally Clark v. Todd*, 192 Md. 487, 492, 64 A.2d 547, 549 (1949).

272 Md. at 24, 320 A.2d at 271. Although the Court purported to be responding to arguments that Hechinger had no cognizable interest, the Court instead responded to an entirely different argument concerning equity jurisdiction. The Court did not discuss whether the Sunday laws protected Hechinger's competitive interests, and none of the cases cited by the Court support its ruling on standing. (In *Dvorine*, the Court specifically refrained from ruling on standing. 170 Md. at 668, 185 A. at 565.) Since *Dart Drug* cannot fairly be read as overruling *Cook*, we believe *Dart Drug* is simply anomalous and should be limited to its facts.

## IV.

The term "franchise" has acquired several different usages through the years, and so we caution that the species of franchise with which we are here concerned should not be confused with, for example, a corporate charter, a licensing agreement, a regulatory permit or license, or the right to vote. We address the type of franchise most commonly associated with a utility company's right to dig up the public streets in the course of providing its particular service. Almost any utility company serving individual households will need to make some use of public streets or other public property in order to transmit its product to its customers, whether this be by hanging wires from poles, laying cables in the ground, or running pipes along a road. Such permanent encroachments on public property for private use would, in the absence of authorization, constitute a public nuisance and a trespass against the governing authority. *See Board of County Comm'rs v. Bell Atl.-Md., Inc.*, 346 Md. 160, 170–71, 695 A.2d 171, 176 (1997) (a public service company suing for damage to its underground cables which were laid without any governmental authorization has the status of a trespasser); *Adams v. Commissioners of Trappe*, 204 Md. 165, 169–71, 102 A.2d 830, 833–34 (1954) (all unauthorized permanent encroachments on public streets for private use are public nuisances). Although a municipality can authorize minor encroachments in any number of ways (by license, permit, or perhaps even acquiescence), *Huebschmann v. Grand Co.*, 166 Md. 615, 624–25, 172 A. 227, 231 (1934), a utility company will generally require the type of ongoing and widespread authorization that only a franchise can provide. 1 A.J.G. Priest, *Principles of Public Utility Regulation* 230–31 (1969). Of course, franchises apply to industries beyond modern day utilities. They also apply to streetcars, toll roads and bridges, ferry boats, motor buses, and any other undertaking that requires regular private use of public property. *See generally* 63 Am.Jur.2d *Franchises* §§ 1–4 (1968); 37 C.J.S. *Franchises* §§ 2–5 (1997).

 The franchise is an unusual privilege that is not easily explained by reference to other, more common rights and privileges. Perhaps the most precise description of a franchise, first adopted by the Court of Appeals over a hundred years ago, is "a special privilege conferred by the State on certain persons, and which does not belong to them of common right." *State v. Philadelphia, W. & B. R.R. Co.*, 45 Md. 361, 379 (1876). The franchise's most salient feature is that, not being "of common right," it does not exist in the people collectively at common law but is rather a privilege that can only be granted by the General Assembly, or by a local government pursuant to power specifically delegated by the General Assembly. *Charles County Sanitary Dist., Inc. v. Charles Utils., Inc.*, 267 Md. 590, 598, 298 A.2d 419, 423 (1973).

 The franchise is clearly a valuable property right, and it is thus subject to valuation and taxation along with other property. *Philadelphia, W. & B.*, 45 Md. at 379. Strictly speaking, the franchise is neither real estate nor an interest in real estate, even though the exercise of a franchise by installing conduits and occupying space in the public streets will usually result in the acquisition of an easement. *Consolidated Gas Co. v. Mayor & City Council of Baltimore*, 101 Md. 541, 545–46, 61 A. 532, 534 (1905). The franchise itself is more accurately characterized as an "incorporeal hereditament." *Van Dyck v. Bloede*, 128 Md. 330, 335, 97 A. 630, 632 (1916). Perhaps the closest functional relative of the franchise is the license, although a license is "less extensive in its duration and incidents than a franchise." *Huebschmann*, 166 Md. at 622, 172 A. at 230. Furthermore, a license is imposed primarily for the purpose of regulation or for revenue, and it merely authorizes the exercise of a restricted privilege instead of creating a privilege where none existed previously. *Greenfeld v. Maryland Jockey Club*, 190 Md. 96, 105–06, 57 A.2d 335, 338–39 (1948).

 To a lesser extent, franchises also implicate the law of contract. *Mayor of Baltimore v. Chesapeake & Potomac Tel. Co.*, 92 Md. 692, 696, 48 A. 465, 466 (1901). The franchise is

itself referred to as a contract between the grantor and grantee, and since such a contract confers "exceptional privileges and powers," it is to be strictly construed against the franchisee. *Id.* As it makes no difference to our analysis of standing whether the franchise is a property right or a contract right, we will refer to the franchise as simply a property right for the remainder of this opinion.

 Since a franchise is a valuable property right, a franchisee has standing in court to protect its franchise from unwarranted interference or encroachment by others, including city authorities, *id.* at 694, 48 A. at 465, or competitors. *Charles County Sanitary Dist.*, 267 Md. at 595, 298 A.2d at 422. A franchisee may also enjoin any physical interference with its right to lay conduits, whether such interference arises from the municipality, a competitor, or an adjoining landowner. *See* 36 Am.Jur.2d *Franchises* §§ 42–43, 70. Franchises can be either exclusive or non-exclusive, and an exclusive franchise is, in effect, a contractual promise by the granting authority not to grant any similar franchises to anyone else. *See* 37 C.J.S. *Franchises* § 20b. An exclusive franchise is not necessarily the same thing as a monopoly, but a grant of any similar franchises by the granting authority will constitute interference with the exclusive franchise. *Id.*

Even non-exclusive franchises, however, carry a type of exclusive privilege. In *Kelly v. Consolidated Gas, Elec. Light & Power Co.*, 153 Md. 523, 138 A. 487 (1927), a case we will discuss in great detail below, the Court of Appeals quoted with approval the proposition that holders of non-exclusive franchises can enjoin competition by one who possesses no such franchise.

"The plaintiff may maintain its suit for an injunction. It has a franchise right to transport passengers between the points named. That right carries with it heavy obligations to the public. Although that franchise right is not exclusive against other grants authorized by the Legislature, it is exclusive against one conducting competition, as is the

defendant, without a franchise or license[4] and contrary to law."

*Id.* at 529, 138 A. at 489 (quoting *New York, N.H. & H. R.R. Co. v. Deister,* 253 Mass. 178, 181, 148 N.E. 590, 591 (1925)).[5] *Kelly*'s authority on this point, however, is weakened by the fact that the quoted proposition is inapplicable to *Kelly*'s facts. Both the plaintiff and the defendant in that case possessed valid franchises.

A review of the law of other states reveals almost universal agreement with the *Kelly* proposition that a holder of a nonexclusive franchise has standing to enjoin competition by one lacking any franchise. *E.g., Kinder v. Looney,* 171 Ark. 16, 18–19, 283 S.W. 9, 10 (1926); *City of Groton v. Yankee Gas Services Co.,* 224 Conn. 675, 685–86, 620 A.2d 771, 776 (1993); *Central States Electric Co. v. Incorporated Town of Randall,* 230 Iowa 376, 386, 297 N.W. 804, 809 (1941); *Reo Bus Lines Co. v. Southern Bus Line Co.,* 209 Ky. 40, 43–44, 272 S.W. 18, 19 (1925); *Gulf States Utils. Co. v. Dixie Elec. Membership Corp.,* 185 So.2d 313, 315 (La.Ct.App.1966); *Deister, supra; Village of Blaine v. Independent Sch. Dist. No. 12,* 265 Minn. 9, 22, 121 N.W.2d 183, 193 (1963); *Payne v. Jackson City Lines,* 220 Miss. 180, 191, 70 So.2d 520, 523 (1954); *Lincoln Traction Co. v. Omaha, L. & B. Ry. Co.,* 108 Neb. 154, 159–60, 187 N.W. 790, 793 (1922); *Millville Gas Light Co. v. Vineland Light & Power Co.,* 72 N.J.Eq. 305, 307–08, 65 A. 504, 505

---

**4.** As neither *Deister, Kelly,* nor the instant case involves licenses, we may put aside for the moment the reference made to licensee standing, which we consider to be an entirely separate question. *See* discussion *infra.*

**5.** In their brief, BGE and Comfort Link attempted to distinguish *Kelly* by asserting that the plaintiff in that case wielded an exclusive franchise. That position is erroneous; the exclusive portion of the plaintiff's franchise had expired over a year prior to the filing of the suit. 153 Md. at 525, 528, 138 A. at 488, 489. The fact that the Court discussed the exclusive properties of non-exclusive franchises at all demonstrates that a non-exclusive franchise was at issue. We point out the error because it represents an understandable reading in isolation of certain ambiguous sentences, as well as the case reporter's notes. We also took note that counsel did not repeat the error at oral argument.

(1906); *Central Crosstown R.R. Co. v. Metropolitan St. Ry. Co.,* 16 A.D. 229, 234–35, 44 N.Y.S. 752, 756–57 (N.Y.App.Div. 1897); *City Coach Co. v. Gastonia Transit Co.,* 227 N.C. 391, 395, 42 S.E.2d 398, 400 (1947); *Bartlesville Elec. Light & Power Co. v. Bartlesville Interurban Ry. Co.,* 26 Okla. 453, 458, 109 P. 228, 229 (1910); *Citizens' Elec. Illuminating Co. v. Lackawanna & Wyo. Valley Power Co.,* 255 Pa. 145, 155, 99 A. 462, 465 (1916); *Memphis St. Ry. Co. v. Rapid Transit Co.,* 133 Tenn. 99, 109, 179 S.W. 635, 638 (1915) (*Memphis St. Ry. Co. I* ); *Lindsley v. Dallas Consol. St. Ry. Co.,* 200 S.W. 207, 210 (Tex.Civ.App.1917); *Turner v. Hicks,* 164 Va. 612, 617, 180 S.E. 543, 545 (1935); *Puget Sound Traction, Light & Power Co. v. Grassmeyer,* 102 Wash. 482, 490, 173 P. 504, 507 (1918); *Carson v. Woodram,* 95 W.Va. 197, 202, 120 S.E. 512 (1923). *See also Frost v. Corporation Comm'n,* 278 U.S. 515, 521, 49 S.Ct. 235, 237, 73 L.Ed. 483 (1929). *But see Coffeyville Mining & Gas Co. v. Citizens' Natural Gas & Mining Co.,* 55 Kan. 173, 40 P. 326 (1895) (discussed *infra* ).

While most states follow the rule that all franchises are exclusive against unfranchised competition, very few cases actually explain the reasoning behind the rule. A notable exception is the *Bartlesville* case, in which the Supreme Court of Oklahoma explained that the rule does not *per se* protect the franchisee's interest in avoiding all competition but follows of necessity from the heavy obligations that any franchisee owes to the public.

When plaintiff accepted its franchise, it did so subject to the power of the municipality to grant to other persons or corporations similar franchises, and with the knowledge that it might be compelled to exercise its rights under its franchise with others exercising similar rights. If, by the competition of rival companies to whom the use of the streets and public grounds has been granted by the municipality, plaintiff is rendered unable to discharge the obligations of its contract to furnish the city and its inhabitants with light and power at stipulated prices, except at a financial loss to it, plaintiff cannot complain, for it must be held to have contemplated such condition might arise and to

have agreed thereto, when it accepted the franchise; but such cannot be said of the defendant who unlawfully occupies the streets and public grounds of the city in competition with plaintiff.

By its unlawful acts defendant can and will take from plaintiff a portion of its business. At the same time defendant is under no obligation to the city or its inhabitants, and is all the while maintaining upon the streets and public grounds of the city a public nuisance, and the loss plaintiff sustains is to defend its fruits from its violation of the law. By these unlawful actions of defendant plaintiff may be rendered financially unable to comply with the obligations of its contract, and may be subjected to suits for damages, mandamus proceedings to enforce the performance of its contract, or an action to forfeit its franchise. Defendant does not undertake to compete with plaintiff for the business of the city and its inhabitants by furnishing to them light and power other than by the use of the streets and alleys. Its right to sell light and power is not dependent upon any franchise, but its right to use the streets and public grounds of the city for that purpose does depend upon the consent of the city; and, when it uses the streets without that consent, it is not only guilty of maintaining a public nuisance, but also inflicts upon plaintiff a special injury by its unlawful act which may be restrained.

*Id.* at 457–58, 109 P. at 229–30. Thus, while a non-exclusive franchisee cannot complain of being driven to unprofitability by competition from one either possessing a franchise or not needing to make use of the streets, when the competitor has no franchise, and yet appropriates public property for private use, then a franchisee has standing to defend its franchise in court. "[A]ny attempted exercise of such rights, without legislative sanction, operates as a direct invasion of the private property rights of those upon whom the franchises have been so conferred." *Millville,* 72 N.J.Eq. at 307, 65 A. at 505.

We re-affirm the overwhelming majority rule stated in *Kelly,* and we hold that a non-exclusive franchisee has standing to enjoin unfranchised competition. According to the

facts as presented in Trigen's complaint, Trigen possesses a non-exclusive franchise to use the streets of downtown Baltimore for the transmission of steam. Comfort Link has submitted a bid on a steam heating contract which apparently will bring that company into competition with Trigen and will require Comfort Link to make use of steam pipes in the public streets within the same general area covered by Trigen's franchise. Baltimore City has not granted a franchise to Comfort Link, but the City has granted one to BGE. On these facts alone it appears that Trigen would have standing as a franchisee to enjoin Comfort Link's unfranchised competition, but none of the parties have relied on these facts alone. All involved have apparently proceeded on the assumption either that BGE and Comfort Link are the same entity for franchise purposes or that BGE has in some way transferred its franchise rights to Comfort Link.[6]

We thus confront a situation in which a holder of a non-exclusive franchise seeks to enjoin competition by another franchisee on the grounds that the latter's franchise is invalid. The general rule appears to be that only the granting authority may challenge the validity of a franchise. *See* 36 Am.Jur.2d *Franchises* § 20; 37 C.J.S. *Franchises* § 28. Trigen argues, however, that this rule is subject to the same exceptions applicable in all public rights cases and that it must be afforded an opportunity to protect its valuable franchise property right through just such a challenge.

BGE and Comfort Link claim that the Court of Appeals has already ruled in *Kelly* that a franchisee cannot challenge the validity of a competitor's franchise. We disagree with their reading of *Kelly*, which, in all fairness, is a complex case. The plaintiff in that case, the Northern Maryland Power Company, had provided electricity and street lighting to the city of Havre de Grace since before 1902 under franchises granted from both the General Assembly and the city. In January of

---

6. Ordinance No. 624 appears to contemplate that BGE will exercise its franchise through Comfort Link.

1927, the city informed Northern that its services to the city would cease in June and that the city would immediately enter into negotiations with Consolidated Gas, Electric Light & Power Company to take Northern's place. (As a historical note, it appears that Consolidated is a corporate predecessor of appellee BGE. 153 Md. at 527, 138 A. at 489.) In March, the city contracted with Consolidated to provide electric service, and Northern then immediately sued [7] to enjoin Consolidated from exercising its franchise until it applied for authorization from the PSC. (We will, of course, discuss this aspect of *Kelly* when we address Trigen's standing to enforce the MPSCL, but for present purposes we focus solely on the issue of standing to challenge the validity of a competitor's franchise.) Eight days after the suit was filed (but still months before Northern's service was slated to end), the city repealed every ordinance that had ever granted a city franchise to Northern. *Id.*, 138 A. at 488. The lower court dismissed the complaint for undisclosed reasons, and Northern appealed.

On appeal, Consolidated argued that appellant Northern no longer had standing to seek any injunction because Northern's city franchise(s) had been repealed. The Court, however, rejected Consolidated's argument and accepted Northern's standing by noting that Consolidated "is not in a position to dispute, under its own claim of a state-wide franchise, the right of the appellant, the Northern Company, to exercise" its franchise. *Id.* at 528, 138 A. at 489. The Court then decided that, because Northern had an electric plant and system operating in the city, Northern had "sufficient apparent show of interest and value for us to hold, until and unless otherwise decided in a direct proceeding by the city of Havre de Grace, that it has a right to maintain this suit." *Id.* at 529, 138 A. at 489.

---

7. Also serving as plaintiffs were twenty-one citizens of Havre de Grace, one of whom presumably provided the case's name. The Court, of course, had no reason to address the standing of these citizens once satisfied that Northern had standing. *See People's Counsel v. Crown Dev. Corp.*, 328 Md. 303, 317, 614 A.2d 553, 559–60 (1992).

BGE and Comfort Link interpret this language to mean that there can be no collateral attacks by competitors on the validity of franchises and that Trigen accordingly has no standing to do so here. A closer reading of the entire *Kelly* case, however, indicates that the Court was not stating such a broad proposition of law as BGE and Comfort Link maintain. The Court was merely stating that Consolidated was not "in a position" to dispute Northern's franchise because such an argument was inconsistent with Consolidated's arguments on the merits. Aside from any question of city franchises, both Consolidated and Northern possessed state-wide franchises granted directly by the General Assembly under the same statute. Each party acquired its franchise prior to 1902. In 1902, the General Assembly enacted a law requiring any utility company to obtain the consent of the Havre de Grace authorities before making use of that city's public streets, and in 1910 the Assembly enacted the MPSCL, requiring PSC approval before any utility exercises any franchise in any new area. Consolidated maintained that it was not required to obtain PSC approval because its state-wide franchise was granted prior to, and thus could not be made subject to, the MPSCL. This argument was flatly inconsistent with Consolidated's simultaneous claim that Northern had no franchise right to serve Havre de Grace, because under Consolidated's rubric, Northern's co-extensive franchise could not have been amended by the statute creating the need for local consent. The Court eventually embraced the view that state-wide franchise rights vest only when the franchise actually has been exercised and that franchises are subject to later amendment by statute with regard to all other areas. Such a view of the case would have lead to the conclusion that Northern had a valid state-wide franchise with regard to Havre de Grace, but the Court disposed of Consolidated's argument by instead refusing to let that party simultaneously argue contrary interpretations of the same franchising statute. Thus, we do not read *Kelly* as establishing any rule regarding a franchisee's standing to challenge the validity of a competitor's franchise.

Trigen relies on two other Maryland cases to support its standing to challenge the validity of a competitor's franchise, but those cases provide no real support at all. In *Charles County Sanitary Dist., supra,* a sewerage company sought to extend its service into a new area. The local sanitary district refused to recognize the sewerage company's franchise right to do so and imposed conditions on the extension that the company considered unreasonable. The company brought an action seeking injunctive relief and a declaration that it had a valid franchise to serve the area in question. The Court of Appeals determined that the company had never acquired any franchise whatsoever, even in the areas it was already serving. 267 Md. at 599, 298 A.2d at 424. Standing was never discussed, and the case is otherwise distinguishable because the plaintiff sought to establish the validity of its own claimed franchise rather than to challenge the validity of a competitor's franchise.

In Trigen's second case, *Commissioners of Cambridge v. Eastern Shore Pub. Serv. Co.,* 192 Md. 333, 64 A.2d 151 (1949) (*Commissioners of Cambridge I*), a town had recently been granted authority by the General Assembly to construct its own electricity system, but the utility company then providing all electricity for the town claimed to have an exclusive franchise to do so. The town brought an action for a declaratory judgment that the utility was without any franchise to serve the town. The town admittedly could have simply applied for construction authorization from the Public Service Commission and awaited a challenge from the utility based on its purported exclusive franchise, but the town hoped to settle the issue prior to incurring the substantial costs incident to such an application. The lower court found that the PSC had exclusive jurisdiction over the issues and dismissed the case, but the Court of Appeals allowed the case to proceed. *See also Commissioners of Cambridge v. Eastern Shore Pub. Serv. Co.,* 194 Md. 653, 72 A.2d 21 (1950) (*Commissioners of Cambridge II*) (dismissing a subsequent appeal for lack of a final or appealable order). Again, standing was never discussed, and this case even lacks the factual details necessary

for any reliable postmortem analysis of standing. It would appear, however, that the town would have had standing to challenge anyone's claim to a franchise right over the town's streets.

With no Maryland authority on point, we again turn to the law of other jurisdictions, which shows a considerable degree of consistency. When competing franchise rights are claimed, courts will generally permit challenges to the validity of franchises on any grounds that would render a franchise invalid. Courts have permitted franchisees to attack competing franchises for being granted without legislative authority, *Goddard v. Chicago & N.W. Ry. Co.*, 202 Ill. 362, 366, 66 N.E. 1066, 1067 (1903); *Central States Elec. Co.*, 230 Iowa at 386, 297 N.W. at 809; *Elizabeth City v. Banks*, 150 N.C. 407, 410, 64 S.E. 189 (1909); *Lindsley*, 200 S.W. at 211; for being granted in violation of the United States Constitution, *Frost*, 278 U.S. at 519–21, 49 S.Ct. at 237; *In re City of Brooklyn*, 143 N.Y. 596, 607, 38 N.E. 983, 985 (1894); for being granted in violation of a state constitution, *City of Princeton v. Princeton Elec. Light & Power Co.*, 166 Ky. 730, 734, 179 S.W. 1074, 1076 (1915); *Lincoln Traction Co.*, 108 Neb. at 163, 187 N.W. at 794; *Patterson v. Wollmann*, 5 N.D. 608, 612, 67 N.W. 1040, 1041–42 (1896); and for being granted in violation of a state law. *Gas Service Co. v. Consolidated Gas Utils. Corp.*, 145 Kan. 423, 427, 65 P.2d 584, 586–87 (1937); *Consumers Power Co. v. Michigan Consol. Gas Co.*, 213 Mich.App. 82, 86, 539 N.W.2d 550, 552 (1955); *Bartlesville*, 26 Okla. at 458, 109 P. at 230; *Eldridge v. Fort Worth Transit Co.*, 136 S.W.2d 955, 969 (Tex.Civ.App.1940).

In the instant case, Trigen's particular challenge to the validity of its competitor's franchise is based on alleged violations of the Baltimore City Charter, and these alleged violations may be fairly characterized as procedural. We note that several of the cases just cited involved alleged procedural deficiencies, *Gas Service Co.; City of Princeton; Consumers Power Co.; Lincoln Traction Co.; Eldridge;* and we take special note of the following cases permitting challenges based on procedural requirements contained in city charters: *Atlan-*

ta Ry. & Power Co. v. Atlanta Rapid–Transit Co., 113 Ga. 481, 488–89, 39 S.E. 12 (1901) (city council allegedly never voted on the ordinance in the proper manner after a motion for reconsideration was made); Memphis St. Ry. Co. v. Rapid Transit Co., 138 Tenn. 594, 599, 198 S.W. 890, 891 (1917) (Memphis St. Ry. Co. II ) (ordinance allegedly not signed into law by the mayor); Fort Worth Gas Co. v. Latex Oil & Gas Co., 299 S.W. 705, 710 (Tex.Civ.App.1927) (ordinance allegedly not submitted for referendum).

The cases we have found in which a party was denied the opportunity to challenge the validity of a competitor's franchise are either distinguishable or of questionable authority. The parties have repeatedly and with great vigor argued the wisdom of KAKE–TV and Radio, Inc. v. City of Wichita, 213 Kan. 537, 516 P.2d 929 (1973), in which the Supreme Court of Kansas held that a radio and television broadcasting company had no standing to challenge the legality of a franchise recently granted to a cable television system. The case is distinguishable on the fundamental grounds that although the plaintiff broadcaster's sole interest in the case was in preventing competition, nowhere in the case is there any mention that the broadcaster had any franchise or even any claim to a franchise. This lack of a franchise should not be surprising considering that a broadcaster has no need to make constant use of public streets. Therefore, even assuming that the cable company's franchise was completely invalid, the KAKE plaintiff still would have lacked standing to enjoin this competitor for want of any justiciable, legal interest in the matter. Unfranchised competition, it should be recalled, only becomes privately actionable when it interferes with the legal right of another, and the plaintiff in KAKE simply had no claim to any such right. And, since the plaintiff could not enjoin unfranchised competition, there was no basis for allowing the plaintiff to challenge the validity of its competitor's franchise.

Two other cases rejecting standing to make such challenges are also distinguishable for the same reason that the party making the challenge did not possess a franchise. Town of Coushatta v. Valley Elec. Membership Corp., 139 So.2d 822

(La.App.1961); *In re Douglass*, 118 Pa. 65, 12 A. 834 (1888). These cases differ from *KAKE*, however, in that the posture of the parties was reversed: instead of a plaintiff being denied standing to challenge a defendant's franchise, the latter cases involve defendants who were denied standing to challenge the plaintiffs' franchise. We are hesitant to overstate our approval of these two cases, because in refusing the defendant the opportunity to challenge the validity of the plaintiff's franchise, these courts may have been foreclosing inquiry into their own jurisdiction, as well as the plaintiff's ultimate entitlement to relief. *See Charles County Sanitary Dist.*, 267 Md. at 599, 298 A.2d at 424 (rejecting the plaintiff's claim to any enforceable franchise). Each of these two cases is also distinguishable on alternate grounds. In *Town of Coushatta*, the town itself was a plaintiff and clearly had standing, which, under Maryland law, would render the utility company's standing moot. *People's Counsel v. Crown Dev. Corp.*, 328 Md. 303, 317, 614 A.2d 553, 559–60 (1992).

The additional basis for distinguishing *In re Douglass* is the nature of the attack on the franchise. The defendant argued that the plaintiff had violated a provision of his own franchise by failing to maintain his ferry and landings in good condition. 118 Pa. at 76, 12 A. at 839–40. The provision at issue was, at most, a condition subsequent, enforcement of which is generally reserved for the grantor alone as a matter of property and contract law. *Harmon v. State Roads Comm'n*, 242 Md. 24, 42–43, 217 A.2d 513, 523 (1966) ("No principle of law is more securely established than that which requires the enforcement of a breach of a condition subsequent to be made by formal entry by the grantor. . . ."); *Inasmuch Gospel Mission v. Mercantile Trust Co.*, 184 Md. 231, 237, 40 A.2d 506, 509 (1945) (only the state may seek the forfeiture of corporate charter). Thus, the nature of the challenge injected new standing problems into the case. Other states addressing the same issue have reached similar conclusions. *See Memphis St. Ry. Co. II*, 138 Tenn. at 604–05, 198 S.W. at 892 ("Forfeiture of such franchise, or its impeachment for invalidity because of a breach of a condition subse-

quent, we think, falls within the rule of the minority cases—that a proceeding in the name of the State on authority of the attorney-general is necessary."); *Fort Worth Gas Co.*, 299 S.W. at 708 (denying the defendant standing to take advantage of "the nonperformance of a condition subsequent" contained in the franchise itself). In the instant case, no part of Trigen's complaint seeks the invalidity or forfeiture of BGE/Comfort Link's franchise solely on the basis of a violation of a condition subsequent.

The only case squarely on point which holds that a franchisee has no standing to assail the validity of a competitor's purported franchise is *Coffeyville Mining & Gas Co. v. Citizens' Natural Gas & Mining Co.*, 55 Kan. 173, 40 P. 326 (1895), which we consider to be of questionable wisdom and authority today. The city council in Coffeyville, Kansas, granted an exclusive franchise to a natural gas utility, even though another utility was already operating in the area under a non-exclusive franchise. After the local attorney general commenced an action to annul the exclusive franchise as having been enacted by corrupt means, the existing natural gas provider brought a separate action testing the validity of the exclusive franchise and seeking to enjoin the defendant from laying any pipes. The Supreme Court of Kansas stated the general rule that only the public authorities may test the validity of ordinances and then ruled:

> It is apparent then that the plaintiff has no standing in court to litigate the principal questions it seeks to present. It can neither test the validity of the ordinances under which the defendants claim a right to act, nor could it, if no ordinances had been passed, try the right of the defendant to lay pipes in the streets for the purpose of supplying natural gas.

*Id.* at 179, 40 P. at 328. Consequently, the Supreme Court of Kansas rejected not only the plaintiff franchisee's standing to challenge the validity of a competitor's franchise but also rejected, albeit in *dicta*, the proposition that a franchisee can enjoin unfranchised competition. The Court cited no authority for its ruling.

A fair reading of *Coffeyville* is that the Court based its ruling with regard to franchise challenges on its unsupported ruling that franchisees cannot even enjoin unfranchised competition. Other courts have already taken the *Coffeyville* Court to task for the latter ruling. *Bartlesville*, 26 Okla. at 456, 109 P. at 229 (criticizing *Coffeyville* as "supported neither by the better reason nor by the weight of authorities"); *Memphis St. Ry. Co. II*, 138 Tenn. at 603, 198 S.W. at 892 ("The text-writers pronounce against the doctrine of [*Coffeyville*].... "); *Lindsley*, 200 S.W. at 209, 211 (discussing *Coffeyville* but concluding that "not only the current of authority, but the better reason as well, supports the right to challenge such grants"). *See also Wichita Transp. Co. v. People's Taxicab Co.*, 140 Kan. 40, 43, 34 P.2d 550, 551–52 (1934) (quoting favorably the majority rule of franchisee standing from *Deister, supra* ). Given Maryland's (and the rest of the nation's) embrace of franchisee standing to enjoin unfranchised competition, there is hardly any reason to follow *Coffeyville* for what appears to be an extension of a contrary rule.

*Coffeyville* has never been overruled by the Supreme Court of Kansas, but the case's specific holding that a franchisee lacks standing to challenge the validity of a competitor's franchise has been undermined by later Kansas cases. The Kansas Court has cited *Coffeyville* for this specific proposition on only two occasions, *Baxter Tel. Co. v. Cherokee County Mut. Tel. Ass'n*, 94 Kan. 159, 163, 146 P. 324, 326 (1915); *KAKE*, 213 Kan. at 541, 516 P.2d at 932; but neither of these two cases presented an applicable set of facts. In *KAKE*, as previously noted, the plaintiff never had or even claimed a franchise and thus lacked any legal interest in the case at all. In *Baxter*, a franchisee sued to force its competitor to obtain a *license* from the state public utilities commission, an entirely distinct question. *See* discussion *infra*. On the other hand, a situation directly on point was presented in *Gas Service Co., supra*, and in that case the Supreme Court of Kansas reached a result directly contrary to *Coffeyville*. In *Gas Service Co.*, a plaintiff natural gas franchisee sued in *quo warranto* to challenge the validity of a franchise granted by the city of Wichita

to the defendant, and the Court ruled that the plaintiff could litigate the issue. 145 Kan. at 429, 65 P.2d at 588. Without ever mentioning *Coffeyville*, the Court acknowledged that it had formerly applied a narrower rule in *Baxter*, but it noted, "In later decisions this court has relaxed this rule somewhat." [8]

Although other courts have occasionally stated the proposition that a distinction exists between standing to enjoin unfranchised competition and standing to challenge the validity of a competitor's franchise, we have found no other decision that rests upon application of such a rule. On the other hand, a multitude of cases already cited have permitted just such challenges. Given that Trigen has a right in the nature of a property right to exclude unfranchised competition, we are of the opinion that Trigen must necessarily be afforded the opportunity to prove that the competition in question is unfranchised. If this can only be accomplished by proving that a facially valid franchise is invalid, then it follows that Trigen has a real property interest at stake in this challenge. *Accord Habliston v. City of Salisbury*, 258 Md. 350, 353–55, 265 A.2d 885, 887 (1970) (one demonstrating a particularized invasion of a legal right has standing to challenge the validity of an ordinance). We prefer the majority rule over the *Coffeyville* rule, and we find that Trigen has an interest that is both cognizable and sufficient to endow Trigen with standing to challenge the validity of its competitor's franchise as against the procedural requirements of the Baltimore City Charter.

## V.

The next issue is whether Trigen also has standing by virtue of its franchise to enjoin a competitor for failure to

---

**8.** Forty years after *Gas Service Co.*, the *KAKE* Court attempted to reconcile this line of cases on the grounds that the local franchise-granting authority was made a party defendant on its own motion in *Gas Service Co.* but was not made a party to the case at all in either *Coffeyville, Baxter,* or *KAKE,* 213 Kan. at 543, 516 P.2d at 933. We find this distinction unpersuasive since the issue of standing cannot be waived by any party and is entirely separate from the issue of joinder of necessary parties.

obtain the authorizations required under the MPSCL. Once again, we take our bearings from the polestar case of *Kelly*. The Court of Appeals held in *Kelly* that the Northern Maryland Power Company, an electricity provider and a franchisee, had standing to enjoin competition from rival electricity provider/franchisee Consolidated Gas Electric Light & Power Company until such time as Consolidated obtained statutorily required approval of its proposed service from the PSC. 153 Md. at 529, 138 A. at 489. The facts of our case could hardly be more similar. Trigen is a steam heat provider and a franchisee, and it seeks to enjoin a rival steam provider/franchisee from competing until such time as the competitor obtains statutorily required approval of its proposed service from the PSC. Purely on the basis of controlling precedent, we have little choice but to rule that Trigen has standing to seek just such an injunction. As a doctrinal matter, however, we are troubled by the fact that *Kelly* 's decision on standing may be in conflict with the rule of standing adopted therein, as well as later cases. Further explanation requires further analysis of *Kelly*.

It will be recalled that both Northern and Consolidated enjoyed state-wide franchises granted under the same statute. Northern had served the city of Havre de Grace since before 1902, but in 1927 the city terminated Northern's service and contracted with Consolidated for new service. Northern's complaint sought to enjoin Consolidated from (1) constructing and laying gas lines within the town and (2) *extending* Consolidated's existing lines *in the direction of* the town. Statutes enacted in 1902 and 1910 required utilities to obtain Havre de Grace's consent and the PSC's approval, respectively, but Consolidated argued that its state-wide franchise predated, and thus was not subject to, either of those laws.

The Court employed two separate approaches in addressing Consolidated's arguments. Under the first approach, the Court began by reasoning that, since Consolidated had not actually exercised its state-wide franchise within the territory of Havre de Grace prior to 1902, its franchise rights had not vested with regard to that territory as of that time. Thus,

Consolidated's franchise could be amended by the 1902 law requiring city consent. *Id.* at 532, 138 A. at 490. Then the Court ruled that, when the city granted such consent in 1927, Consolidated in effect acquired a completely new and distinct franchise that, unlike its state-wide franchise, was already subject to the 1910 MPSCL:

> It is evident from the decisions in this state that the ordinance of the Mayor and City Council of Havre de Grace, consenting to the use of its streets by the appellee, was a franchise, and, before its exercise, required the approval of the Public Service Commission and permission for its exercise.

*Id.* at 539, 138 A. at 493. This approach to the case, however, did not resolve the question of whether Northern was entitled to enjoin Consolidated from *extending* existing service lines *in the direction of* the city, because such activity was beyond the scope of the law requiring the city's consent. Therefore, under its second approach, the Court ruled that since Consolidated's state-wide franchise rights had not vested with regard to any territory where they had not been exercised, all post–1910 extensions, including the 1927 Havre de Grace extension, were subject to the 1910 preapproval requirement.[9] *Id.* at 541, 138 A. at 494.

The only basis for standing that can be gleaned from *Kelly* is the Court's adoption of the proposition that "[T]h[e] franchise right is not exclusive against other grants authorized by the Legislature, [but] it is exclusive against one conducting competition . . . without a franchise or license and contrary to law." This proposition, however, has no direct application to *Kelly,* because Consolidated *possessed a valid franchise* (or perhaps two different ones) *authorized by the legislature.* This would seem to deprive the court of jurisdiction under the rule quoted. It is true that the Court also made reference to Northern's existing electric plant just before ruling that

---

9. As Judge Offutt pointed out in his dissent in *Kelly,* this second approach appears sufficient to decide the entire case and may have obviated any need for the first approach.

Northern had a "sufficient apparent show of interest and value," *id.* at 529, 138 A. at 489; but it cannot be seriously contended today that this plant entitled Northern to any protection from competition.

We are at a loss as to how we can reconcile the facts of *Kelly* with the rule of standing therein adopted. The two could be reconciled if PSC approval could be considered the equivalent of a franchise for purposes of standing, but we find no support for such equivalency. First of all, the *Kelly* Court can hardly be accused of conflating the two concepts, considering the lengths to which it went to make sure that the MPSCL did not infringe upon any vested franchise right of the defendant. Secondly, the Court of Appeals has since held that the PSC cannot grant a franchise because it is entirely without authorization from the General Assembly to do so. *Commissioners of Cambridge I,* 192 Md. at 339, 64 A.2d at 154 (citing *Kelly* for support).

Nor can we reconcile *Kelly* through expansive interpretations of the rule of standing it adopted. It is true that the Court of Appeals inherited some *dicta* from the Supreme Judicial Court of Massachusetts referring to licenses, but Maryland has always recognized a strict separation between franchises and all lesser privileges, including licenses. *Greenfeld,* 190 Md. at 105–06, 57 A.2d at 338–39 (licenses regulate the exercise of rights existing at common law while franchises grant privileges not previously enjoyed of common right); *Huebschmann,* 166 Md. at 622, 172 A. at 231 (a single permanent encroachment in a street may be authorized by a permit, but ongoing authority requires a franchise). The only Maryland cases we have found addressing a licensee's standing to enjoin unlicensed competition have rejected such standing. *Edgewater Liquors, Inc. v. Liston,* 349 Md. 803, 811, 709 A.2d 1301, 1304 (1998) (competitor liquor licensees are not within the statutory definition of "licensees" with standing to challenge license grants); *Baltimore Retail Liquor Package Stores Ass'n,* 171 Md. at 429, 189 A. at 210 ("As holders of liquor licenses [plaintiffs] have no franchises or exclusive privileges to be affected" by the allegedly improper renewal of

their competitors' licenses). Furthermore, given the narrow set of circumstances under which competition constitutes encroachment on a franchise, and since a mere license is incapable of conferring the rights contained in a franchise, it follows that a competitor's failure to obtain a license, by itself, can never amount to a violation of a franchisee's property rights. *Cf. Purnell v. McLane,* 98 Md. 589, 592–93, 56 A. 830, 831 (1904) (the right to trade in electricity is open to all, subject to regulatory restriction by the state; it is only the use of the streets to transmit the electricity that requires an affirmative grant of a franchise).

Trigen has also suggested that the reason it has standing to enjoin violations of the MPSCL is that such competition is "contrary to law" and thus is covered by the tail end of the *Kelly* rule. We are of the opinion, however, that the language "without a franchise ... *and contrary to law* " merely means "without a franchise *that is required by law.*" This latter reading has the virtue of mooring the rule to situations in which competition actually invades a franchisee's property rights. *Cf. Intermountain Elecs., Inc. v. Tintic Sch. Dist.,* 14 Utah 2d 86, 88, 377 P.2d 783, 785 (1963) (a cable television franchisee's property rights are not invaded as a result of competition from a broadcast television company not making private use of public streets). The broader reading Trigen suggests would seem to apply to violations of *any* law and would thus turn any franchisee into the policeman of its competitors, with standing to enjoin violations of, for example, traffic laws or employment laws. *Contra Tennessee Elec. Power Co.,* 306 U.S. at 140, 59 S.Ct. at 370 (franchisees have no standing to enjoin allegedly illegal loans to competitors or other allegedly illegal acts generally); *Denver Tramway Corp. v. People's Cab Co.,* 1 F.Supp. 449, 452 (D.Colo.1932) (a streetcar franchisee can enjoin taxis from mimicking the streetcar's routes, but it cannot enjoin unrelated violations of traffic or licensing laws). Such a result would be clearly absurd, and yet absurd in an insightful way. If the reason it sounds absurd for a competitor to enforce a traffic law is because traffic laws have nothing to do with competition,

whereas the MPSCL arguably does, then this is an indication that the inquiry has strayed beyond the realm of property rights and into the realm of rights "conferred by a statute."

It may come as no surprise that many other states are in accord with *Kelly* 's main thrust, that a public service company has standing to enjoin a competitor's violation of a regulatory law. Some foreign cases even appear to agree with *Kelly* 's specific rationale that such standing is based on the plaintiff's franchise property interest. *Kinder,* 171 Ark. at 19, 283 S.W. at 10; *Kosciusko County Rural Elec. Membership Corp. v. Public Serv. Comm'n,* 225 Ind. 666, 675–76, 77 N.E.2d 572, 576 (1948); *Reo Bus Lines Co.,* 209 Ky. at 43–44, 272 S.W. at 19; *Campbell Sixty–Six Express, Inc. v. J. & G. Express, Inc.,* 244 Miss. 427, 436, 141 So.2d 720, 724 (1962); *City Coach Co.,* 227 N.C. at 395, 42 S.E.2d at 400; *Davis v. Clevinger,* 127 Wash. 136, 138, 219 P. 845, 845 (1923); *Calumet Serv. Co. v. City of Chilton,* 148 Wis. 334, 349–50, 135 N.W. 131, 137 (1912). Yet, in each of these cases, one of two distinguishing characteristics was present: either the regulatory commission at issue enjoyed the statutory authority to grant actual franchises (turning approval itself into a franchise) or the court treated the grant of regulatory approval as the legal equivalent of a franchise. As we have already explained, neither proposition is in accord with the law of this state.

Although *Kelly*'s explicit rationale has been undermined, we believe that its result can be followed in this case based on the alternate rationale that standing is conferred by the MPSCL itself. *See South Carolina Elec. & Gas Co. v. South Carolina Pub. Serv. Auth.,* 215 S.C. 193, 204–05, 54 S.E.2d 777, 781–82 (1949) (plaintiff utility company has standing to enjoin a competitor's violation of the utility regulatory law even though plaintiff's franchise rights are not invaded thereby); *Public Utils. Bd. v. Central Power & Light Co.,* 587 S.W.2d 782, 786 (Tex.Civ.App.1979) (same). While we have admittedly backed ourselves into this proposition, there is support for it in our case law.

The parties are not in complete accord as to how a court should test whether a particular interest is rendered cognizable by virtue of a statute. Trigen never directly addresses this issue at all, preferring precedent over doctrine, while BGE and Comfort Link argue in support of the so-called "zone of interests" test adopted by the Supreme Court of the United States in *Association of Data Processing Serv. Orgs. Inc.*, 397 U.S. at 153, 90 S.Ct. at 830 ("[The question of standing concerns] whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute . . . in question."). The zone of interests test, however, has never been adopted in Maryland. The Court of Appeals mentioned the federal zone of interests test in passing in *Sugarloaf Citizens' Ass'n*, 344 Md. at 295, 686 A.2d at 617; but the Court neither applied the test nor expressed any real approval of the particular standard contained therein. The zone of interests test was applied in *News Am. Div., Hearst Corp. v. State*, 294 Md. 30, 40, 447 A.2d 1264, 1269 (1982), but apparently only because the Court thought it mete to employ a federal test of standing to a claim involving federal First Amendment rights. Maryland courts have tended to rely on marginally less liberal standards for statutory standing. *Dart Drug*, 272 Md. at 24, 320 A.2d at 271 (plaintiff must show the statute "was passed for his benefit"); *Cook*, 176 Md. at 398–99, 4 A.2d at 749 (plaintiff has standing if "[the law gives] an exclusive privilege or advantage," if "one of the purposes of the enactment is to protect the [plaintiff] against unauthorized competition," if "the statute was enacted for his advantage or for the advantage of a class to which he belongs," if the statute "intended to confer privileges or advantages"); *Baltimore Retail Liquor Package Stores Ass'n*, 171 Md. at 429, 189 A. at 210 ("[I]t was not within the purpose of the statute to restrict competition for the benefit of any licensee.").

■ Ultimately, we need not decide which test to apply, because the Court of Appeals has already provided us with our answer, albeit transposed from a slightly different context. On at least three prior occasions, the Court of Appeals has

entertained actions brought by a public service company to challenge the PSC's decision to authorize another public service company to enter into competition against the plaintiff. *Maryland Transp. Co. v. Public Serv. Comm'n,* 253 Md. 618, 253 A.2d 896 (1969); *Baltimore Tank Lines v. Public Serv. Comm'n,* 215 Md. 125, 137 A.2d 187 (1957); *Tidewater Express Lines v. Public Serv. Comm'n,* 199 Md. 533, 87 A.2d 158 (1952). None of these cases explicitly discussed standing, but together they indicate that a public service company's interest in avoiding competition is sufficient by itself to provide standing in court when a claim is made that the MPSCL has been violated. The cases cannot be completely distinguished by the fact that the plaintiffs were, in effect, appealing from proceedings in which they already were participants, because administrative standing is not determinative of judicial standing. *Edgewater Liquors, Inc.,* 349 Md. at 806, 709 A.2d at 1302; *Sugarloaf Citizens' Ass'n,* 344 Md. at 285–86, 686 A.2d at 613; *Kreatchman,* 224 Md. at 214–15, 167 A.2d at 348.

Other cases provide further support for the more general proposition that one of the interests animating the MPSCL is the prevention of competition among public service companies. *Maryland Transp. Co.,* 253 Md. at 628–29, 253 A.2d at 902 (the PSC is authorized to determine whether monopoly or competition between carriers is in the public interest); *Barton v. Public Serv. Comm'n,* 214 Md. 359, 365, 135 A.2d 442, 445–46 (1957) (same); *Clark v. Public Serv. Comm'n,* 209 Md. 121, 132–33, 120 A.2d 363, 369 (1956) (the PSC's "obligation . . . to protect a common carrier against competition" is secondary to its obligation to secure adequate and inexpensive service for the public); *Capital Transit Co. v. Bosley,* 191 Md. 502, 511, 62 A.2d 267, 272 (1948) ("The power to fix minimum rates . . . relates to the prevention of . . . destructive competition."); *Bosley v. Quigley,* 189 Md. 493, 508–09, 56 A.2d 835, 842 (1948) (the PSC's finding of adequate existing service supported its decision to exclude competitors); *Maryland People's Counsel v. Heintz,* 69 Md.App. 74, 87, 94, 516 A.2d 599, 606, 609 (1986) (the introduction of competition into the interexchange telecommunications market justified the PSC's decisions to alter

its rate-making method and the utility's rate of revenue return).

In fact, the very concept of a "public service" company or a utility company has traditionally been imbued with the exclusion of competition, on the theory that market forces would either produce a monopoly or else would not provide the entire population with adequate access to the particular type of service. *See New State Ice Co. v. Liebmann*, 285 U.S. 262, 281–82, 52 S.Ct. 371, 376, 76 L.Ed. 747 (1932); 1 Priest, *supra*, at 361–69; *see also Black's Law Dictionary* 1232 (6th ed. 1990) ("[A public utility] is always a virtual monopoly."). Movements are currently afoot to introduce competition into many markets that have traditionally been served by a limited number of public service corporations, but this only confirms the fact that competitive interests are intimately associated with the public interest in the field of public utilities regulation.

In sum, we find that Trigen has standing both to challenge the validity of its competitor's franchise and to enjoin a competitor for failure to obtain PSC authorization. Of course, we express no opinion on the merits of any claim, nor have we addressed any other possible impediments to relief that may still lie before Trigen (such as ripeness, administrative exclusivity, preclusion, etc.). We only hold that Trigen's interest is sufficient to be heard in court.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS.**

**COSTS TO BE PAID TWO–THIRDS BY APPELLEES BALTIMORE GAS & ELECTRIC COMPANY AND THE DISTRICT CHILLED WATER LIMITED PARTNERSHIP AND ONE–THIRD BY APPELLEE CITY OF BALTIMORE.**